**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| Todd Tennin,<br><br>Plaintiff ,<br><br>vs.<br><br>Torres, Dan Minke, Jessica Fergen, Pearson, Shlattman, Foush, Uran, McCorkel, Stephanie Kaphing, Jennifer Chapman, Alexandria Tibbets, Nicole Nielsen, and Z. Morth,<br><br>Defendants. | Case No. 24-cv-464 (SRN/SGE)<br><br>**REPORT AND RECOMMENDATION** |

This case is before the Court on Defendants' Motion for Summary Judgment and has been referred to the undersigned by United States District Judge Susan R. Nelson for a report and recommendation under 82 U.S.C. § 636(b)(1)(B). For the reasons set forth below, this Court recommends that the Motion for Summary Judgment be granted.

## FACTS

On February 14, 2024, Plaintiff Todd Tennin commenced this action under 42 U.S.C. § 1983 alleging that Defendants violated the Eighth Amendment of the Constitution by depriving him of food and medical care. Defendants are corrections officers and nurses at the Minnesota Correctional Facility in Oak Park Heights ("MCF-OPH"), where Mr. Tennin is an inmate. Defendants now move for summary judgment.

## I. Hunger Strike Policy

On January 23, 2022, Mr. Tennin began a hunger strike while an inmate at MCF-OPH.[1] (Wolff Decl. Ex. 3.) On February 3, 2022, MCF-OPH moved Mr. Tennin to the Transitional Care Unit ("TCU") so his health could be monitored more closely as his hunger strike continued. (Wolff Decl. Ex. 3; Chapman Decl. ¶ 3.)

Under Minnesota Department of Corrections ("DOC") policy, when an inmate is on hunger strike, facility staff is required to follow specific procedures to ensure the inmate's health and safety. (Wolff Dec. Ex. 1.) Specifically relevant here, correctional staff is required to provide the inmate with three meals per day, water twice per hour during waking hours, and to monitor and log all "liquid and solid intake and offerings of food and water in the segregation log." (*Id.* at 2.)

The inmate is closely monitored by a multi-disciplinary care team, including medical and correctional staff. (*Id.* at 1.) Nurses are required to check in with the inmate every day for a health assessment, which involves measuring and documenting the inmate's weight, blood pressure, pulse, respiration, and skin condition. (*Id.* at 3.) If the inmate refuses the assessment, the nurse must note the refusal in the daily log. (*Id.*)

Once an inmate is deemed to be on a hunger strike, he is moved to segregation to limit covert access to food and water so that staff may accurately monitor the inmate's food intake and health. (*Id.* at 2; Wolff Decl. ¶ 11.) As noted, however, staff are required to provide the inmate with three meals per day and water twice per hour. (Wolff Decl. Ex.1,

[1] Mr. Tennin is serving a 480-month state sentence for second-degree murder. (Stockmeyer Decl. Ex. 3.)

at 2.) Meals must be left with the inmate for the duration of meal service. (*Id.*) If, however, the inmate's "actions pose a threat to staff safety," staff may offer a meal without placing the meal directly in the inmate's cell. (*Id.*; Mercure Decl. ¶ 15.)

## II. Mr. Tennin's Time in the TCU

Mr. Tennin was in the TCU from February 3, 2022, to April 18, 2022. Although he regularly refused medical assessments, staff observed that he was "relatively stable" and "not in acute distress" despite experiencing weight loss. (Wolff Decl. Ex. 3, at 2; Dauffenbach Decl. ¶ 6.) Staff decided to offer Mr. Tennin Ensure, a nutritional supplement, while he was in the TCU. (Wolff Decl. ¶ 27.) This decision was not required by the hunger strike policy nor was it common. (*Id.* ¶ 28.) Staff discontinued the Ensure after determining that it was "counterproductive to [Mr. Tennin's] overall health and well-being" and that the "extra calories and nutrition enabled him to prolong his hunger strikes." (*Id.*)

## III. Mr. Tennin's Time in the ADU

On April 18, 2022, Mr. Tennin was moved to the Administrative Control Unit (ACU) - MCF-OPH's most restrictive segregation unit - after he threw urine and feces at a nurse and correctional officer.[2] (Wolff Decl. Ex. 3, at 2; *id.* at Ex. 7, at 1-2.)

In the ACU, one person is assigned per cell. (Mercure Decl. ¶ 8.) Each cell has a sally port, which is a secured space between the main hallway and the inmate's cell door. (*Id.* ¶ 9.) Both the sally port door and the cell door are locked. (*Id.*) By entering the sally

[2] Mr. Tennin was charged with two counts of felony assault in Washington County. (Stockmeyer Decl. Ex. 4.) He pleaded guilty to one count and was sentenced to an additional year in prison. (*Id.* Exs. 5, 6.)

port, staff are able to deliver meals through a "covered slot called a book pass" adjacent to the cell door. (*Id.*) Because the book pass is large enough to fit a meal tray, opening the door presents a security risk for staff. (*Id.* ¶ 10; *see* Fergen Decl. ¶ 12.) To avoid possible assaults on staff, inmates are required to sit on the bed when staff deliver meals through the book pass. (Mercure Decl. ¶ 10.)

Mr. Tennin was housed in the ACU from April 18, 2022, until October 19, 2022, except for a few days he spent in another unit. (Pawelk Decl. Ex. 2, at 2.) Mr. Tennin was on hunger strike for most of his time in the ACU. (Mercure Decl. ¶ 15; Wolff Decl. ¶ 25.) He routinely refused to participate in daily health assessments and would only sometimes choose to eat the food delivered to him by correctional staff.[3] (*See, e.g.*, Pawelk Decl., Ex.6, at 1-3, 4-17, 37-41; Ex.7, at 3-4, Ex. 8; Wolff Decl. Ex. 2.) He was again offered Ensure four times per day, which he drank infrequently. (*See* Wolff Decl. Ex. 2, at 3, 6, 9-12, 21, 23-24.)

In addition to refusing medical assessments and meals, Mr. Tennin frequently used his feces and urine to create difficulties and safety hazards for staff. On July 6, 2022, Mr. Tennin placed his urine in empty juice and milk cartons, which spilled on the corrections officer collecting meal bags. (Pawelk Decl., Ex. 9, at 6-7.) Staff also repeatedly found feces or urine covering the floor of Mr. Tennin's sally port or smeared on the inside of his cell. (*Id.* Decl. Ex. 6, at 4, 20-32, 56-58; *id.* Ex.9.; Wolff Decl. Ex. 2, at 2, 3, 12.) This behavior often prevented staff from serving meals and caring for Mr. Tennin given the

[3] Mr. Tennin agreed to be weighed only five times between June and September 2022. (Wolff Decl. ¶ 47.) His lowest weight during that period was 153 pounds, which is within a healthy body mass index range. (*Id.* ¶¶ 47-48.)

obvious health and safety risks associated with exposure to urine and fecal matter. (Wolff Decl. ¶¶ 38-39; Dauffenbach Decl. ¶ 14; Nielsen Decl. ¶ 11.) Staff were also concerned that he would again assault staff with bodily fluids if given the chance. (Nielsen Decl. ¶¶ 12-13; Minke Decl. ¶ 14.)

If feces were present, staff often felt unsafe entering Mr. Tennin's sally port or cell. (Minke Decl. ¶ 14; Nielsen Decl. ¶¶ 12-13; Schlattman Decl. ¶¶ 7-8.) They would typically offer Mr. Tennin the chance to clean his sally port or cell with cleaning supplies, but he refused to do so. (*See, e.g.*, Pawelk Decl. Ex.6, at 4, 28, 31, 32, 61; Wolff Decl. Ex. 2, at 3, 4.) Deeming it unsafe, staff members would sometimes then decline to enter the sally port to leave him a meal or Ensure, or to conduct his medical assessment. (Pawelk Decl. Ex.6, at 4, 20, 23, 25, 29, 32; Ex. 9, at 2; Wolff Decl. Ex. 2, at 4, 5-7, 12.)

When that occurred, Mr. Tennin was not provided with the meals and medical care he was entitled to under the hunger strike policy. Defendants believe that Mr. Tennin created health and safety hazards so he could force them into a policy violation. (Mercure Decl. ¶ 16.)

Mr. Tennin cites the DOC's Personal Protective Equipment (PPE) Policy to support his position that prison staff could have served him meals despite the presence of feces and urine by simply wearing PPE. (Tennin Aff. ¶ 7; *id.* Ex. C, Dkt. 104.) The PPE Policy states that employees "must wear additional PPE to prevent exposure to blood or other potentially infections material." (Tennin Ex. C, at 6.) The Policy does not state that staff are required to deliver meals or provide non-emergency medical services when feces are present, even if PPE is used. (*See id.*)

In fact, absent an emergency, "staff members are not required to enter a sally port . . . contaminated with feces." (Wolff Decl. ¶ 36.) According to Joan Wolff, DOC Associate Director of Nursing and former Director of Clinical Operations at MCF-OPH, this is due to the biohazard fecal matter presents:

> Feces carr[y] bloodborne pathogens. Exposure to another's feces is highly likely to be deemed a significant exposure requiring further medical management for the employee. Moreover, Health Services staff work throughout their correctional facility. If they are exposed to an incarcerated person's feces, there is a serious risk of transferring that feces elsewhere in the facility and thereby potentially exposing other incarcerated persons and staff to those pathogens.
>
> * * *
>
> There are also health and safety risks associated with introducing food into an environment contaminated with feces. Eating around feces, even one's own feces, can risk exposure to e-coli.

(*Id.* ¶¶ 38, 39.)

On July 21, 2022, MCF-OPH's Safety Administrator issued a directive stating that whenever there was a "body fluid spill offense," ACU staff members were required to "[s]top all non-emergency services to the offending [inmate], including food delivery, until a biohazard cleanup takes place." (Mercure Decl., Ex.1.) In case of an emergency, "all responding staff [are required to] wear necessary protective gear." (*Id.*) The directive was designed to "reduce staff exposure to human body fluid spills and associated hazards in sallyports or cells." (*Id.*) Corrections staff are required to follow the Safety Administrator's directives. (Fergen Decl. ¶ 5.)

## IV. Grievances

Between June and October 2022, Mr. Tennin filed numerous formal grievances against the corrections officer and nurse defendants named in this case. Those grievances form the basis for this lawsuit.

### A. June 11, 2022, Grievance Against Lt. McCarty

In the first grievance at issue, Mr. Tennin complained that Lt. McCarty ordered Officer Minke not to feed him or enter his sally port in violation of the law and the hunger strike policy. (Pawelk Decl. Ex. 3, at 1.) MCF-OPH responded that staff could not safely deliver food due to feces covering the floor of the sally port, which Mr. Tennin refused to clean up. (*Id.*)

Officer Minke, who worked in the ACU distributing meals and assisting nurses with medical assessments on June 11, 2022, has explained in more detail what happened. (Minke Decl. ¶¶ 8, 11.) Officer Minke was familiar with Mr. Tennin and aware that he had assaulted officers in the past and regularly spread feces around his cell. (*Id.* ¶¶ 4-5.) The morning was uneventful. Mr. Tennin refused breakfast and, later, a bottle of Ensure. (*Id* ¶ 11.) When Officer Minke returned midday, he noticed small balls of feces covering the sally port. (*Id.* ¶ 13.) He determined that he could not enter the sally port without stepping in feces and therefore could not deliver Mr. Tennin's lunch. (*Id.* ¶ 14.) Officer Minke offered Mr. Tennin the opportunity to clean the cell with paper towels and disinfectant, but he refused to do so. (*Id.* ¶ 15.) Officer Minke reported the incident to his superior, Officer McCarty. (*Id.* ¶ 16.) Later that afternoon, Officer Minke again offered

Mr. Tennin cleaning supplies and said he could have Ensure if Mr. Tennin cleaned his cell. (*Id.* ¶ 17.) Mr. Tennin again refused. (*Id.*)

### B. June 24-June 28, 2022, Grievance Against Officers Pearson, Schlattman, and Uran

The next June grievance contains several instances of alleged misconduct by officers. Mr. Tennin complained that Officers Pearson, Schlattman, and Uran refused to feed him or offer nutritional supplements on June 24 through June 28, 2022.[4] (Pawelk Decl. Ex. 3, at 13.) MCF-OPH responded that staff could not safely deliver food due to feces and urine covering the floor of the sally port, which Mr. Tennin refused to clean up. (*Id.* at 13-14.)

The record provides more context. On June 24, 2022, Mr. Tennin refused to eat breakfast and lunch. (Pawelk Decl. Ex.6, at 18.) He was apparently upset because nursing staff were not providing him with the Ensure flavors he liked. (*Id.*) Later that day, Mr. Tennin poured shower water under his cell door into the sally port. (*Id.*) Staff turned the water off, which upset Mr. Tennin. (*Id.*)

That evening, Officer Schlattman declined to deliver Mr. Tennin's dinner because there were at least twenty-four balls of feces in the sally port. (Pawelk Decl. Ex.6, at 20; Schlattman Decl. ¶¶ 7-8.) Mr. Tennin refused to clean the mess over the next couple of days – despite being offered cleaning supplies several times - which caused staff members, including Officers Uran and Fausch, to decline to serve Mr. Tennin meals due to safety

---

[4] In this grievance, he also complained about Officer Minke failing to feed him on June 11, 2022. (Pawelk Decl. Ex. 3, at 13.) Because that incident occurred in the context of his first grievance, it will not be addressed again here.

concerns. (Pawelk Decl. Ex. 6, at 23, 25, 28-29, 32; *id.* Ex. 10; Uran Decl. ¶ 8.) on June 26, Mr. Tennin had a sign on his cell door instructing, “No Ensure. No Assessment. No Food.” (Wolff Decl. Ex. 2, at 5.)

On June 27, 2022, Officer Pearson was again unable to deliver meals and Ensure due to feces in Mr. Tennin’s sally port. (Pawelk Decl. Ex.6, at 29.) Despite the presence of feces, a nurse offered Mr. Tennin a bottle of Ensure that day, but he refused. (Wolff Decl., Ex. 2, at 6.) Supervising officers instructed staff that Mr. Tennin could not receive meals or Ensure unless he cleaned the sally port to allow for safe delivery. (Pawelk Decl. Ex.6, at 28.) Mr. Tennin was offered cleaning supplies, but he again refused to clean. (*Id.*)

The next day, Mr. Tennin still refused to clean the sally port and was not served breakfast. (*Id.* at 32.) Lt. Mercure ultimately cleaned the sally port for Mr. Tennin. (*Id.* at 31-32.) Despite this, Mr. Tennin told Lt. Mercure he “would continue to put feces in his sally port.” (*Id.* at 31.)

At lunchtime, Mr. Tennin refused to sit on his bed for meal delivery, as he was required to do for staff safety. (*Id.* at 32; Mercure Decl. ¶ 10.) Staff took this as a refusal to eat. (Pawelk Decl. Ex.6, at 32.) Staff were unable to safely deliver Mr. Tennin’s dinner. (*Id.* at 33.)

Given the frequency of the issue and the staff’s inability to serve Mr. Tennin’s meals over a few days, officials at MCF-OPH ordered staff to “temporarily stop all non-emergent services, including meal delivery, when fecal matter is present in his sally port,” to immediately request that maintenance clean the sally port, and then provide Mr. Tennin his meal. (Pawelk Ex. 10 at 2.)

### C. September 2, 2022, Grievance Against Officer McCorkle

In September, Mr. Tennin complained that Office McCorkle refused to feed him because he was still in possession of nail clippers. (*Id.* Ex. 3, at 45.) MCF-OPH explained that he could not be served dinner while he still had the clippers. (*Id.*)

According to the record, on September 2, 2022, Mr. Tennin refused multiple bottles of Ensure and blocked his book pass so meals could not be delivered. (Pawelk Decl. Ex.6, at 48.) Officer McCorkle attempted to deliver Mr. Tennin's dinner but first required Mr. Tennin to return nail clippers he was allowed to have earlier in the day. (*Id.* at 49.) Officer McCorkle was concerned that Mr. Tennin could use the nail clippers to assault staff through the book pass. (McCorkel Decl. ¶¶ 4, 7.) Mr. Tennin later returned the nail clippers and was served dinner, which he refused to eat. (Pawelk Decl., Ex.6, at 49.)

### D. September 20, 2022, Grievance Against Lt. Fergen and Officer Torres

Over two weeks later, Mr. Tennin complained that Lt. Fergen did not feed him on September 20, 2022. (Pawelk Decl. Ex. 3, at 51.) MCF-OPH responded that staff could not safely deliver meals until he was moved to a clean cell, at which time staff were authorized to give him a meal. (*Id.*)

The record establishes that on September 19, 2022, Mr. Tennin refused to eat any meals and stated that he was going on hunger strike. (*Id.* at 55, 60.) On September 20, 2022, however, he ate breakfast and drank a bottle of Ensure. (*Id.* at 60.) He then used feces to write profane messages on the walls of his cell and smeared feces on his windows. (*Id.* at 57.)

Later that day, staff moved Mr. Tennin to a clean cell, where he ate lunch and drank Ensure. (*Id.* at 56-60.) That evening, Mr. Tennin again spread feces around his new cell and used feces to cover his cell windows with paper. (*Id.* at 61-64.) Officer Torres instructed Mr. Tennin to remove the paper, which Mr. Tennin refused to do. (*Id.* at 64.) Lt. Fergen and Officer Fausch told Mr. Tennin that they could not feed him with the cell covered in feces. (Mercure Decl. ¶ 21.; *id.* Ex. 2, at 00:40-00:50, 2:20.) Mr. Tennin began removing the paper from the window but put it back up. (*Id.* at 00:50—01:30.) Lt. Fergen told Mr. Tennin they would need to deploy chemical spray if he did not remove the paper. (*Id.* at 01:08—01:12.) Lt. Fergen then explained to her officers that Mr. Tennin could not be served meals if they could not see through the windows and feces were likely in the sally port. (*Id.* at 01:45—01:52.)

Staff told Mr. Tennin that he only needed to clean the feces off the windows and book pass to be served dinner. (Mercure Decl., Ex. 2, at 3:00-0:3:30, 04:30-05:30.) He refused. (*Id.*) Lt. Fergen then decided to move Mr. Tennin to a clean cell, his third of the day. (*Id.* at 06:30—08:50; Fergen Decl. ¶ 16.) Once there, Mr. Tennin refused to be medically assessed. (Mercure Decl. Ex. 2, at 23:40—23:55.) It is unclear whether Mr. Tennin was offered dinner and, if so, if he ate.

**E. October 2, 2022, Grievance Against Officer Torres**

Approximately eleven days later, on October 2, 2022, Mr. Tennin complained that Officer Torres did not provide him with another dinner tray after he spilled his first tray. (Pawelk Decl. Ex. 3, at 63.) MCF-OPH explained that because the first tray was dropped,

Officer Torres could not determine what Mr. Tennin had eaten, thus preventing him from providing additional food. (*Id.*)

On October 2, 2022, Mr. Tennin refused to eat food but drank two servings of milk for breakfast and had some lunch. (Pawelk Ex. 6, at 77.) Soon after dinner was left in his cell, Mr. Tennin reported that he had spilled the tray. (*Id.*) Skeptical that it was an accident given previous similar conduct, Officer Torres told Mr. Tennin that he needed to verify the amount Mr. Tennin managed to eat on the original tray before more food could be delivered. (*Id.*) He was transferred to another cell and resumed his hunger strike. (*Id.*)

### F. Nursing Staff Grievances

On August 18, 2022, Mr. Tennin submitted several formal grievances against various nursing staff members. (Pawelk Decl. Ex. 4, at 3-6, 14-19, 20-21.) His grievances are based on generalized complaints about his care, including that nursing staff (1) declined to deliver Ensure when feces were present in the sally port, (2) declined to provide medical assessments, (3) lacked the equipment to do a proper medical assessment, and (4) falsely stated that he refused medical services. (*See id.* at 3-6, 14-19, 20-21.) The nurses have submitted declarations denying Mr. Tennin's claims and citing his use of feces and urine to impede their ability to tend to him. (*See* Dauffenbach Decl. ¶¶ 12-14; Nielsen Decl. ¶¶ 8-9; Chapman Decl. ¶¶ 12, 15-16; Pawelk Decl. Ex. 2, at 12.) The record is devoid of any indication that Mr. Tennin was in any medical distress or in need of immediate medical attention during the events at issue in this case. (*See* Pawelk Decl. Exs. 3-9; Wolff Decl. Ex. 2.)

## ANALYSIS

### I. Legal Standard

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' only if it may affect the outcome of the lawsuit." *TCF Nat'l Bank v. Mkt. Intelligence, Inc.*, 812 F.3d 701, 707 (8th Cir. 2016). Likewise, an issue of material fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the burden of establishing a lack of genuine issue of fact, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), and the Court must view the evidence and any reasonable inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In responding to a motion for summary judgment, however, the nonmoving party may not "'rest on mere allegations or denials,' but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." *Krenik v. Cnty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995).

### II. Failure to Exhaust

Under the Prison Litigation Reform Act (PLRA), "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "[E]xhaustion under § 1997e(a) means proper exhaustion, that is, using all steps that the agency holds out, and

doing so properly (so that the agency addresses the issues on the merits)[.]" *Hammett v. Cofield*, 681 F.3d 945, 947 (8th Cir. 2012) (quotations and citation omitted). In other words, "a prisoner must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a precondition to bringing suit in federal court." *Id.* (quotations and citations omitted).

The DOC has a multi-step grievance procedure. (Pawelk Decl. Ex. 1.) The first step includes informal resolution through kites submitted by the inmate. (*Id.* at 2 § B.) If the issue is not resolved, the inmate may file a formal grievance within thirty days of the incident "and no sooner than seven calendar days of when they sent a kite trying to resolve the issue." (*Id.* at 3 § C(2)(a).) If the inmate is not satisfied with the result of the formal grievance, he may file a grievance appeal with the grievance appeal authority. (*Id.* at 5 § D(2).) The appeal must be filed within twenty-one days of the date the facility responded to the formal grievance. (*Id.* at 5 § D(2)(a).) If the grievance appeal authority does not issue a decision within twenty-one days, the "original grievance decision [is deemed] affirmed and final, and administrative remedies exhausted." (*Id.* at 6 § D(3)(d).)

Here, it is difficult to discern the bases for Mr. Tennin's claim and thus whether he has met the PLRA's exhaustion requirement. His Amended Complaint names the individual Defendants and summarily asserts that each of them violated the Eighth Amendment in their treatment of him, without providing details. (*See* Am. Compl.) The record is helpful, however, in establishing the bases for Mr. Tennin's complaints. In his discovery requests, Mr. Tennin generally identified events occurring between June and September 2022 as the sources of his complaint. (*See* Stockmeyer Decl. Exs. 7-9.) From

there, it appears that Defendants were able to determine the specific incidents leading to this lawsuit and to produce relevant evidence. As a result, the Court understands that Mr. Tennin's claim is based on the grievances set forth in the fact section set forth above.[5]

The Court must now decide if Mr. Tennin fully exhausted those grievances by filing appeals with the grievance appeal authority. The record establishes that Mr. Tennin appealed the grievances detailed above against the corrections officers involved but Mr. Tennin did not appeal his grievances against the nursing staff. (*See* Pawelk Decl. Ex. 5 ¶ 19; Ex. 4.) As a result, his claims against the nurses were not exhausted and must be dismissed.

A closer question is whether he exhausted his grievance against Lt. Fergen for the incidents on September 20, 2022. Although it appears that Mr. Tennin may not have formally appealed his grievance with respect to Lt. Fergen specifically, he did do so as to the events of September 20, 2022. (*See* Pawelk Decl. Ex. 5, at 7.) Under these circumstances, the Court will deem the claim against Lt. Fergen exhausted.

**III. Qualified Immunity**

Defendants[6] argue they are entitled to qualified immunity for alleged violations of Mr. Tennin's Eighth Amendment rights. The doctrine of qualified immunity protects "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or

---

[5] Mr. Tennin has not disputed that this lawsuit involves the grievances and related events identified by Defendants.

[6] Even if the claims against the nurses were exhausted, they would fail on the merits along with those against the correctional officers.

constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982) (internal quotations omitted); *Saterdalen v. Spencer,* 725 F.3d 838, 841 (8th Cir. 2013). To determine whether qualified immunity applies, a court asks (1) whether a constitutional right was violated, and (2) whether the right was "clearly established ... such that a reasonable official would understand his conduct was unlawful." *Vaughn v. Gray,* 557 F.3d 904, 908 (8th Cir. 2009) (quoting *Vaugn v. Greene Cnty.,* 438 F.3d 845 (8th Cir. 2006)). A court may exercise "sound discretion" in deciding which of these questions should be addressed first in light of the facts of a case. *Burton v. Ark. Sec'y of State,* 737 F.3d 1219, 1228–29 (8th Cir. 2013) (quoting *Pearson v. Callahan,* 555 U.S. 223, 236 (2009)). Qualified immunity shields "all but the plainly incompetent or those who knowingly violate the law." *Davis v. Hall,* 375 F.3d 703 (8th Cir. 2004) (quoting *Malley v. Briggs,* 475 U.S. 335, 341 (1986)).

The Court will turn first to whether Defendants violated Mr. Tennin's constitutional right to be free from cruel and unusual punishment under the Eighth Amendment. The Eighth Amendment requires prison officials to "provide humane conditions of confinement" and to "ensure that inmates receive adequate food, clothing, shelter, and medical care." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). In this context, Defendants' conduct is assessed under the "deliberate indifference" standard. *Nelson v. Corr. Med. Servs.*, 583 F.3d 522, 528 (8th Cir. 2009). "A prison official is deliberately indifferent if she 'knows of and disregards' a serious medical need or a substantial risk to an inmate's health and safety." *Id.* (quoting *Farmer*, 511 U.S. at 832.) The burden is on the plaintiff who must demonstrate that: (1) "he suffered from an objectively serious medical need" or

risk to his health and safety, and (2) "Defendants actually knew of but deliberately disregarded his serious medical need" and risk to health and safety. *Id.* at 529. Mr. Tennin has not met this standard.

Mr. Tennin alleges that Defendants were deliberately indifferent to his nutritional and medical needs while he was on hunger strike. The Court disagrees. Even assuming Mr. Tennin's hunger strike itself constitutes a serious medical need, there is no evidence that Defendants deliberately disregarded that need. Other than expected weight loss due to his hunger strike, the record establishes that Mr. Tennin was medically stable and not in distress during the period in question. His BMI was in the normal range, and he was not suffering from any known or suspected illnesses that required immediate attention. That said, Defendants monitored him closely, as required by the DOC's hunger strike policy. Mr. Tennin has submitted no evidence to the contrary.

There can be no deliberate indifference absent negative health consequences caused by the alleged deprivation. *Wishon v. Gammon*, 978 F.2d 446, 449 (8th Cir. 1992). In instances of hunger strikes, "[m]ere weight loss and temporary discomfort are insufficient; the plaintiff must at a minimum have experienced real suffering, extreme discomfort, or lasting detrimental health consequences from the defendant's inaction[.]" *Miles v. Johnston*, 24-CV-1012 (ECT/ECW), 2025 WL 3294004, at *9 (D. Minn. July 10, 2025), *adopted by* 2025 WL 2393188 (Aug. 18, 2025). Mr. Tennin's cited "hunger pangs," (Dkt. 101, at 4), are insufficient to meet this standard.

In addition, during the relevant period, Mr. Tennin declined meals, Ensure, and medical assessments even when his cell was clean. *See Long v. Nix*, 86 F.3d 761, 766 (8th

Cir. 1996) (holding that an inmate's refusal to accept offered care does not constitute deliberate indifference). When his cell was not clean, Defendants were unable to safely deliver meals. This was due solely to Mr. Tennin's actions. He unilaterally created the impediment for him to receive meals and medical assessments by placing feces and urine in his sally port and cell.[7] The record establishes that it would have been unsafe for staff to enter the cell under those circumstances and, indeed, for him to eat in his cell surrounded by feces. It was certainly a violation of prison rules for Mr. Tennin to use his feces and urine in this manner. A deliberate indifference claim cannot be based on a defendant's intentional creation of an untenable situation for prison staff. *See Rodriguez v. Briley,* 403 F.3d 952, 952–53 (7th Cir. 2005) ("[Plaintiff] cannot, in short, be permitted to engineer an Eighth Amendment violation."); *McGee v. Feneis*, No. 07-CV-4868 (PJS/FLN), 2009 WL 2928245, at *7 (D. Minn. Sept. 8, 2009) ("An inmate's deliberate and continued noncompliance with a valid prison rule does not convert the consequences that flow automatically from that noncompliance into unconstitutional punishment under the Eighth Amendment."). The record establishes that any deprivation of food or care was a result of Mr. Tennin's actions, not Defendants'.

It should be noted that Defendants regularly engaged with Mr. Tennin when his cell was unclean in an attempt to provide him with meals and medical assessments. They routinely offered him cleaning supplies and moved him to a clean cell on at least two occasions. Mr. Tennin declined to clean his cell and continued to place his feces and urine

[7] Mr. Tennin does not deny that he regularly placed feces around his cell and sally port.

in the cell and sally port, making it extremely difficult for Defendants to do their jobs safely, even when wearing PPE. On some occasions, prison staff entered Mr. Tennin's cell even when feces were present to deliver food, Ensure, or other services, which he often refused.

Under these uncontroverted circumstances, no reasonable fact finder could conclude that Defendants were deliberately indifferent to Mr. Tennin's nutritional or medical needs.[8] Defendants actions were in keeping with DOC polices and the Constitution. Summary judgment is therefore warranted.

## CONCLUSION

Based on the file, record, and proceedings herein, and for the reasons stated above, **IT IS HEREBY RECOMMENDED** that Defendants' Motion for Summary Judgment (Dkt. 66) be **GRANTED**.

Dated: July 20, 2026

*s/Shannon G. Elkins*
SHANNON G. ELKINS
United States Magistrate Judge

## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. *See* Local Rule 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in Local Rule 72.2(c).

[8] Because the Court concludes that Defendants were not deliberately indifferent to Mr. Tennin's needs, it need not consider whether relevant law was clearly established at the time of the alleged violations.